**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MANUEL JESUS OLIVAS-MOTTA, AKA Manuel Jesus Olivas-Notta, *Petitioner*, | No. 14-70543 |
| | Agency No. A021-179-705 |
| v. | |
| MATTHEW G. WHITAKER, Acting Attorney General, *Respondent.* | OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted September 10, 2018
San Francisco, California

Filed December 19, 2018

Before: J. Clifford Wallace, Johnnie B. Rawlinson,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Wallace;
Dissent by Judge Watford

## SUMMARY[*]

### Immigration

The panel denied Manuel Jesus Olivas-Motta's petition for review of a decision of the Board of Immigration Appeals that found him removable for having committed two crimes involving moral turpitude.

Olivas-Motta, a lawful permanent resident, was placed in removal proceedings based on his convictions for felony endangerment under Arizona Revised Statutes § 13-1201 and facilitation to commit unlawful possession of marijuana for sale. The immigration judge concluded (and the parties did not dispute before this court) that the facilitation offense was a crime involving moral turpitude. The immigration judge and Board determined that felony endangerment was neither categorically a crime involving moral turpitude nor a crime involving moral turpitude under the modified categorical approach, but examined evidence beyond the record of conviction and found the offense involved moral turpitude.

While Olivas-Motta's petition for review was pending before this court, the Board published *In re Leal*, 26 I. & N. Dec. 20 (B.I.A. 2012) *(Leal I)*, which held that felony endangerment under Arizona Revised Statutes § 13-1201 was categorically a crime involving moral turpitude, and this court upheld that determination in *Leal v. Holder*, 771 F.3d 1140 (9th Cir. 2014) *(Leal II)*. Because the Board had not

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

decided Olivas-Motta's appeal on the ground that his offense was categorically a crime involving moral turpitude, this court did not consider *Leal I*'s relevance to Olivas-Motta's petition, but granted the petition and remanded because an immigration judge and the Board are confined to the record of conviction in this context. On remand, the Board dismissed Olivas-Motta's appeal, applying *Leal I* to conclude that felony endangerment was categorically a CIMT.

The panel rejected Olivas-Motta's argument that *Leal II* was wrongly decided, explaining that the panel has no power to overrule circuit precedent.

The panel also rejected Olivas-Motta's argument that the Board's application of *Leal I* was impermissibly retroactive. Concluding that a change in law must have occurred before this court's retroactivity analysis from *Montgomery Ward & Co., Inc. v. FTC*, 691 F.2d 1322 (9th Cir. 1982), is implicated, the panel held that *Montgomery Ward* is only applicable when an agency consciously overrules or otherwise alters its own rule or regulation, or expressly considers and openly departs from a circuit court decision.

Applying this standard to Olivas-Motta's case, the panel concluded that there was no change in law raising retroactivity concerns: before Olivas-Motta pleaded guilty, the Board had never determined in a precedential opinion whether felony endangerment under Arizona Revised Statutes § 13-1201 was a crime involving moral turpitude and, therefore, the application of the statute was simply unclear until *Leal I*.

Olivas-Motta also contended that the Attorney General's decision in *In re Silva-Trevino*, 24 I. & N. 687 (A.G. 2008),

abolished the requirement that a crime with a mens rea of recklessness could not constitute a crime involving moral turpitude unless the offense presented an aggravating factor. The panel disagreed, explaining that the aggravating-factor analysis from earlier cases is harmonious with the later approach in *Silva-Trevino*, and concluding that, as to Arizona felony endangerment, *Silva-Trevino* did not change the law.

Next, the panel rejected Olivas-Motta's argument that, due to both claim and issue preclusion, the Board could not revisit on remand whether his offense was categorically a crime involving moral turpitude. Although Olivas-Motta had not exhausted the issue of preclusion, the panel concluded it had jurisdiction to consider the claim because Olivas-Motta did not have an opportunity to argue it until the Board issued its second decision. On the merits, the panel held that there was no error because both forms of preclusion require the existence of a separate action, but the Board on remand was acting within the same, single proceeding. The panel also concluded that the rule of mandate, which prohibits an agency from deviating from a court's remand order, did not foreclose the Board's consideration of whether the statute was categorically a crime involving moral turpitude because nothing in the remand restricted the Board from considering that issue.

Finally, the panel rejected Olivas-Motta's argument that 8 U.S.C. § 1227(a)(2)(A)(ii), under which Olivas-Motta was found to be removable for having committed crimes involving moral turpitude, is unconstitutionally vague, explaining that the Supreme Court and this court have repeatedly rejected that vagueness challenge and that this panel lacked authority to reconsider this court's prior decisions.

Dissenting, Judge Watford disagreed with the panel's conclusion that *Leal I* was not a change in law necessary to trigger retroactivity analysis. Judge Watford wrote that, under the Board's standards for determining which recklessness offenses were crimes involving moral turpitude in effect at the time Olivas-Motta pleaded guilty, there was at least a realistic chance that his endangerment offense would not be classified as a crime involving moral turpitude. However, after the Attorney General's decision in *Silva-Trevino*, it was nearly certain that his offense would be classified as a crime involving moral turpitude, and the Board's decision in *Leal I* eliminated what little uncertainty remained. According to Judge Watford, this was a change in the governing standard that attached new legal consequences to events completed before its enactment. Applying the retroactivity test from *Montgomery Ward*, Judge Watford concluded that the balance of factors weighs in favor of Olivas-Motta. Judge Watford would grant the petition for review and remand so that the agency could conduct the analysis in the first instance.

## COUNSEL

K. Lee Hartzler (argued), San Diego, California, for Petitioner.

Sarah A. Byrd (argued) and Keith I. McManus, Senior Litigation Counselors; Cindy S. Ferrier, Assistant Director; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

WALLACE, Circuit Judge:

An immigration judge (IJ) ordered Manuel Jesus Olivas-Motta's removal because he had been convicted of two crimes involving moral turpitude (CIMTs). The Board of Immigration Appeals (Board) dismissed Olivas-Motta's appeal from the IJ's order. Olivas-Motta now petitions for review of the Board's dismissal. We have jurisdiction under 8 U.S.C. § 1252, and we deny the petition.

I.

Olivas-Motta is a citizen of Mexico who was admitted to the United States of America as a lawful permanent resident on or about October 12, 1976. He has since been convicted of two felonies. On August 11, 2003, he was convicted of facilitation to commit unlawful possession of marijuana for sale in violation of Arizona Revised Statutes §§ 13-1004, 13-3405. On November 26, 2007, he was convicted of felony endangerment under Arizona Revised Statutes § 13-1201.

On April 2, 2009, the Department of Homeland Security initiated removal proceedings against Olivas-Motta under 8 U.S.C. § 1227(a)(2)(A)(ii) as an alien convicted of two CIMTs. The IJ determined, and the parties no longer dispute, that the facilitation offense was a CIMT. As to the endangerment offense, the IJ determined that it was neither categorically a CIMT nor a CIMT under the modified categorical approach. However, the IJ examined evidence beyond the record of conviction, including police reports, and determined that the offense involved moral turpitude. The IJ then sustained the charge of removal. The Board relied on the same grounds to conclude that the

endangerment offense was a CIMT and dismissed Olivas-Motta's appeal.

Olivas-Motta petitioned for review of the Board's decision. While the petition was pending, the Board published an opinion holding that felony endangerment under Arizona Revised Statutes § 13-1201 was categorically a CIMT. *In re Leal*, 26 I. & N. Dec. 20, 27 (B.I.A. 2012) (*Leal I*). We upheld that determination. *Leal v. Holder*, 771 F.3d 1140, 1148–49 (9th Cir. 2014) (*Leal II*). But we declined to consider *Leal I*'s relevance to Olivas-Motta in his first petition because the Board had not originally decided his appeal on the ground that felony endangerment was categorically a CIMT. *Olivas-Motta v. Holder*, 746 F.3d 907, 917 (9th Cir. 2013), *as amended* (April 1, 2014); *see also Ali v. Holder*, 637 F.3d 1025, 1029 (9th Cir. 2011) (confining our review to grounds relied upon by the Board). Instead, we granted the petition and remanded because "an IJ and the [Board] are confined to the record of conviction in determining whether an alien has been convicted of a CIMT." *Olivas-Motta*, 746 F.3d at 908. On remand, the Board applied *Leal I* to conclude that felony endangerment was categorically a CIMT and dismissed Olivas-Motta's appeal.

Olivas-Motta again petitions for review of the Board's dismissal. He argues that the Board's application of *Leal I* was impermissibly retroactive, that preclusion bars the Board from reconsidering whether felony endangerment was categorically a CIMT, and that the phrase CIMT is unconstitutionally vague.

Olivas-Motta also argues that we are not bound by *Leal II* because it was wrongly decided. But this panel has no power to overrule circuit precedent. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (holding that

circuit precedent may be overturned only en banc, subject to exceptions not applicable here).

## II.

We review constitutional claims and questions of law *de novo*. *Latter-Singh v. Holder*, 668 F.3d 1156, 1159 (9th Cir. 2012); *see also* 8 U.S.C. § 1252(a)(2)(C), (D). Whether a new agency interpretation may be applied retroactively is a question of law. *See Garfias-Rodriguez v. Holder*, 702 F.3d 504, 514–15 (9th Cir. 2012) (en banc). Whether preclusion is available is also a question of law. *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012), *as amended* (May 3, 2012).

## III.

When an agency decides to create a new rule through adjudicatory action, that new rule may apply retroactively to regulated entities. *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). "[R]etroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles." *Id.* "If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." *Id.*

We have applied this rule in the immigration context to determine whether Board decisions may apply retroactively. *See, e.g.*, *Garfias-Rodriguez*, 702 F.3d at 515–23; *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 950–53 (9th Cir. 2007). In such cases, we have relied on the five-factor test set forth in *Montgomery Ward & Co., Inc. v. FTC*, 691 F.2d 1322, 1333 (9th Cir. 1982). Olivas-Motta argues that, in this case, the *Montgomery Ward* factors strongly counsel against retroactively applying *Leal I* to his case, and that the Board

accordingly erred in concluding that Arizona felony endangerment is categorically a CIMT.

## A.

As a threshold matter, we must address whether retroactivity is implicated by *Leal I*. The government argues that a change in law is a prerequisite to *Montgomery Ward* balancing, and that we should not conduct a retroactivity analysis because no change in law occurred. Olivas-Motta argues that the *Montgomery Ward* factors themselves account for whether a change in law has occurred, and that *Montgomery Ward* balancing is therefore appropriate because *Leal I* was decided after his guilty plea.

We conclude that a change in law must have occurred before *Montgomery Ward* is implicated. The requirement that the law have changed in some way is generally a settled principle of retroactivity analysis. *See James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 534 (1991) ("It is only when the law changes in some respect that an assertion of nonretroactivity may be entertained"); *Morales-Izquierdo v. Dep't of Homeland Sec.*, 600 F.3d 1076, 1090 (9th Cir. 2010), *overruled in part on other grounds by Garfias-Rodriguez*, 702 F.3d at 516 ("*Montgomery Ward* and its progeny deal with the problems of retroactivity created when an agency, acting in an adjudicative capacity, so alters an existing agency-promulgated rule that it deprives a regulated party of the advance notice to conform its conduct to the rule"). It would be incongruous to apply a different rule here because the principles animating a statute's retroactivity — "fair notice, reasonable reliance, and settled expectations" — are equally animating in Olivas-Motta's immigration proceedings. *See Vartelas v. Holder*, 566 U.S. 257, 273 (2012) (quoting *Landgraf v. USI Film Prod.*, 511 U.S. 244, 270 (1994)). Moreover, were we to adopt the rule that

*Montgomery Ward* balancing is required regardless of whether a change in law has occurred, the mere existence of a new published decision on an issue would always trigger retroactivity analysis. This too is contrary to settled law on this issue. *See Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 135 (1936) (holding that a tax regulation elaborating on a standard governed by statute "is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand"). We therefore hold that *Montgomery Ward* retroactivity analysis is only applicable when "an agency consciously overrules or otherwise alters its own rule or regulation," or "expressly considers and openly departs from a circuit court decision."[1] *Garfias-Rodriguez*, 702 F.3d at 518–19.

Olivas-Motta's primary argument against this conclusion is the language of the *Montgomery Ward* factors. It is true that the second *Montgomery Ward* factor is "whether the new rule represents an abrupt departure from well established practice or *merely attempts to fill a void in an unsettled area of law*." *Montgomery Ward*, 691 F.2d at 1333 (emphasis added) (quoting *Retail, Wholesale and Dep't Store Union v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972)). This language suggests that a change in law can

---

[1] Judge Watford disagrees with our analysis and would conclude that a change in law occurs when the Board's decision was not "clearly foreshadowed." Diss. at 22. It is true that the Supreme Court has stated that a new principle of law can be established by "deciding an issue whose resolution was not clearly foreshadowed." *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106 (1991). But "agency decisions are not analogous to court decisions." *Garfias-Rodriguez*, 702 F.3d at 520. *Chevron Oil*, which dealt with court decisions, is not apposite when an agency makes an adjudicatory decision that clarifies the scope of a statute it is charged with executing.

occur when the rule was previously unclear, and an adjudicatory decision brings clarity to the issue. But we must consider the *Montgomery Ward* factors in light of the general rules of retroactivity, which require a change of law. In addition, the other *Montgomery Ward* factors themselves contemplate a change from a "former rule" or "old standard." *See Montgomery Ward*, 691 F.2d at 1333 (quoting *Retail*, 466 F.2d at 390). We therefore distinguish between cases where a rule, such as 8 U.S.C. § 1227(a)(2)(A)(ii), already exists, and an administrative decision simply clarifies the rule's application, and cases where the decision itself would "take away or impair vested rights acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability, in respect to transactions or considerations already past." *Vartelas*, 566 U.S. at 266 (alterations omitted) (quoting *Soc'y for Propagation of Gospel v. Wheeler*, 22 F. Cas. 756, 767 (No. 13,156) (CCNH 1814)). In the latter cases, the administrative decision has altered the legal consequences flowing from events and "considerations already past," and thus changed the law. *See id.* (quoting *Soc'y for Propagation of Gospel*, 22 F. Cas. at 767). But in the former, where the adjudicatory decision does not trigger a new obligation, impair a previously vested right, or attach new harm, no new legal consequences flow from the decision, and retroactivity is not implicated. The second *Montgomery Ward* factor is therefore better understood as evaluating the character of a change in law, once such a change has occurred, rather than evaluating whether the change occurred in the first instance.

Olivas-Motta points to language in *Garfias-Rodriguez* suggesting that a change in law is not a prerequisite to *Montgomery Ward* balancing. *See Garfias-Rodriguez*, 702 F.3d at 516 ("Chief Judge Kozinski . . . applies retroactivity principles to conclude that retroactivity analysis

does not apply, effectively resolving the retroactivity question against *Garfias*"). We do not think *Garfias-Rodriguez* stands for the proposition Olivas-Motta believes it does. There was no dispute in that case that the law had changed; rather, the issue was how we should treat the unquestionable change of law of *this circuit* when it was prompted by a decision of the Board. *See id.* at 515–20. *Garfias-Rodriguez* did not hold that *Montgomery Ward* balancing is required when no change in law has taken place.

B

Applying this standard to this case, there was no change in law. Before Olivas-Motta's 2007 guilty plea, the Board had never determined in a precedential opinion whether felony endangerment in Arizona was a CIMT. The Board had only issued unpublished decisions on the issue. *See, e.g*, *In Re Carlos Mario Almeraz-Hernandez*, 2006 WL 3203649, at *2 (B.I.A. Sept. 6, 2006) (holding § 13-1201 is not categorically a CIMT). Unpublished decisions are not precedential and "do not bind future parties." *Marmolejo-Campos v. Holder*, 558 F.3d 903, 909 (9th Cir. 2009). Olivas-Motta therefore cannot argue that *Leal I* "attach[ed] a new disability" to his guilty plea that did not exist at the time he entered it. *See Vartelas*, 566 U.S. at 266 (quoting *Soc'y for Propagation*, 22 F. Cas. at 767). Rather, 8 U.S.C. § 1227(a)(2)(A)(ii) had already created the legal consequences of his plea, and it was merely unclear whether it would apply. *Leal I*'s settling of that ambiguity did not change the law any more than "a judicial determination construing and applying a statute to a case in hand" would have. *See Manhattan Gen. Equip.*, 297 U.S. at 135.

Olivas-Motta counters that, notwithstanding the lack of a precedential opinion on Arizona felony endangerment, *Leal I* still constituted a change in law because of broader

changes in the law of CIMTs. According to Olivas-Motta, the law before 2008 was that a crime with a mens rea of recklessness could not constitute a CIMT unless the offense presented an "aggravating factor," thus preventing Arizona endangerment from qualifying. But after the Attorney General's decision in *In re Silva-Trevino*, 24 I. & N. 687 (A.G. 2008), argues Olivas-Motta, the aggravating-factor requirement was abolished, thus leading to the decision in *Leal I*.

We are not persuaded that *Silva-Trevino* created the change in law identified by Olivas-Motta. As we explained in *Leal II*, the aggravating-factor requirement "[wa]s not due to the reckless mens rea involved, but rather because of the underlying conduct; both this court and the Board have repeatedly stated that simple assault is, in general, not a CIMT." 771 F.3d at 1148. Thus, in Olivas-Motta's cited cases, the aggravating-factor analysis is harmonious with the Attorney General's later approach in *Silva-Trevino*. *Compare In re Fualaau*, 21 I. & N. Dec. 475, 478 (B.I.A. 1996) ("In order for an assault *of the nature at issue in this case* to be deemed a crime involving moral turpitude, the element of a reckless state of mind must be coupled with an offense involving the infliction of serious bodily injury" (emphasis added)), *with Silva-Trevino*, 24 I. & N. Dec. at 689 n.1 ("a crime must involve both *reprehensible conduct* and some degree of scienter, whether specific intent, deliberateness, willfulness, or recklessness" (emphasis added)). The earlier Board cases and *Silva-Trevino* did not apply the aggravating-factor requirement to all recklessness crimes, and *Silva-Trevino* did not purport to overrule decisions holding that simple assault is not a CIMT. *See Leal II*, 771 F.3d at 1148 (stating after *Silva-Trevino*: "It thus follows that, in order for an assault to be considered a CIMT, there must be some additional factor involved in the specific

offense to distinguish it from generic simple assault"). As to Arizona felony endangerment then, *Silva-Trevino* did not change the law.

Olivas-Motta's argument to the contrary relies on unpublished Board decisions on this matter. Olivas-Motta is correct that unpublished Board decisions predating *Silva-Trevino* relied on *Fualaau* to conclude that Arizona endangerment was not a CIMT. *See, e.g.*, *Almeraz-Hernandez*, 2006 WL 3203649, at *2. Olivas-Motta is also correct that *Leal I* cited *Silva-Trevino* as the controlling framework before concluding that Arizona felony endangerment *was* categorically a CIMT. 26 I. & N. Dec. at 21, 27. But once more, unpublished decisions "do not bind future parties." *Marmolejo-Campos*, 558 F.3d at 909. Olivas-Motta's attorney may have made a calculation that Arizona felony endangerment would not be considered a CIMT based on unpublished decisions, but *Fualaau* did not foreclose the conclusion that it was a CIMT before *Silva-Trevino*, nor did *Silva-Trevino* require the Board to conclude that it was a CIMT afterwards. The application of the statute was simply unclear until *Leal I*, at which point the published Board opinion resolved the issue. Put differently, when Olivas-Motta pleaded guilty in 2007, it was possible that his conviction would not be adjudicated a CIMT, but no law guaranteed that. *Leal I*'s conclusive resolution of this uncertainty did not create a new legal harm to Olivas-Motta that did not already exist.

Because there was no change in the law raising retroactivity concerns, the Board did not err by applying *Leal I* to conclude that Arizona endangerment is a CIMT.

IV.

Preclusion prevents parties "from contesting matters that they have had a full and fair opportunity to litigate," thus protecting "against 'the expense and vexation attending multiple lawsuits, conserv[ing] judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)). "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). Under the doctrine of issue preclusion, parties may not relitigate "'an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Id.* (quoting *New Hampshire*, 532 U.S. at 748–49). Olivas-Motta contends that, due to both types of preclusion, the Board could not revisit on remand whether felony endangerment was categorically a CIMT, after determining initially that it was not.

A.

Before we can evaluate Olivas-Motta's argument, we must address whether we have jurisdiction to consider it. The government argues that Olivas-Motta failed to exhaust his administrative remedies because he did not argue preclusion before the Board. Olivas-Motta responds that he could not raise preclusion because it was not implicated until the Board applied *Leal I* to his appeal.

We conclude that we have jurisdiction. 8 U.S.C. § 1252(d)(1) provides that a court may review a final order

of removal only if "the alien has exhausted all administrative remedies available to the alien as of right." We have held that "1252(d)(1) mandates exhaustion and therefore generally bars us, for lack of subject-matter jurisdiction, from reaching the merits of a legal claim not presented in administrative proceedings below." *Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004). But section 1252(d)(1) by its terms limits the petitioner's duty to "remedies available to the alien as of right." We have thus held that we retain jurisdiction over petitions where the challenged agency action was committed by the Board after briefing was completed, because the only remaining administrative remedies for such an action were not available "as of right." *Alcaraz v. INS*, 384 F.3d 1150, 1159–60 (9th Cir. 2004).

In this case, after we granted Olivas-Motta's first petition and remanded to the Board, Olivas-Motta was never provided an opportunity to argue preclusion until the Board issued its second decision. At that point, his only remedies were discretionary, and there was no higher administrative authority to correct the supposed error. *See id.* A petition for review to this court was therefore proper, and section 1252(d)(1) does not divest us of jurisdiction.

## B.

On the merits of Olivas-Motta's preclusion argument, we hold there was no error. Claim preclusion requires a final judgment on the merits in a separate action. *Valencia-Alvarez v. Gonzales*, 469 F.3d 1319, 1323–24 (9th Cir. 2006). By granting Olivas-Motta's petition for review in 2013, his original action continued, and no separate action commenced. *See id.* at 1324. Similarly, issue preclusion only applies when issues are "litigated and decided in the *prior proceedings*." *Oyeniran*, 672 F.3d at 806 (emphasis added). Multiple proceedings are a prerequisite before issue

preclusion can apply. *See id.* Because the Board on remand was acting within the same proceedings as in Olivas-Motta's original appeal, preclusion does not apply.

Olivas-Motta counters this argument by citing an unpublished decision of this court relating to the rule of mandate and making preclusion arguments by analogy. This was also the argument that Olivas-Motta made to the Board on remand. We consider this argument to be a rule of mandate argument, rather than one of claim preclusion or issue preclusion. Olivas-Motta has not argued that the Board could not reconsider this issue because of law of the case.

The rule of mandate is related to, but distinct from, claim preclusion and issue preclusion. Under the rule of mandate, an administrative agency may not deviate from a supervising court's remand order, and the reviewing court may review the agency's decision on remand "to assure that its prior mandate is effectuated." *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989); *see also Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172–73 (9th Cir. 2006) (holding that the rule of mandate applies to decisions of the Board on remand from this court). Thus, as with claim preclusion and issue preclusion, the rule of mandate can prevent parties from relitigating issues already decided. But the scope of the rule is limited to that which is before the court "and disposed of by its decree." *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). An administrative agency may therefore consider on remand "any issue not expressly or impliedly disposed of on appeal." *Stacy v. Colvin*, 825 F.3d 563, 568 (9th Cir. 2016) (quoting *Odima v. Westin Tucscon Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995)).

Our mandate in Olivas-Motta's first petition did not conclude that felony endangerment was not a CIMT, or that

*Leal I* was wrongly decided. 746 F.3d at 916–17. Instead, we "h[e]ld only that that we [could] not deny Olivas-Motta's petition based on a conclusion reached by the [Board] in a separate case decided two years after it decided the appeal now before us." *Id.* at 917. Nothing in our remand restricted the Board from considering the import of *Leal I* on Olivas-Motta's appeal. Accordingly, the rule of mandate did not foreclose the Board's reconsideration of the issue.

## V.

The void-for-vagueness doctrine stems from the Fifth Amendment's guarantee of due process. *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). "[T]he Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Id.* Because "deportation is 'a particularly severe penalty,' which may be of greater concern to a convicted alien than 'any potential jail sentence,'" a provision of immigration law making an alien deportable is subject to the void-for-vagueness doctrine. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (quoting *Jae Lee v. United States*, 137 S. Ct. 1958, 1968 (2017)).

Olivas-Motta argues that, even if applying *Leal I* to his appeal was not impermissibly retroactive or precluded, we should nonetheless grant the petition because 8 U.S.C. § 1227(a)(2)(A)(ii) *itself* is unconstitutionally vague. While he recognizes that both the Supreme Court and this court have repeatedly rejected that argument, *see Jordan v. De George*, 341 U.S. 223, 232 (1951); *Martinez-De Ryan v. Sessions*, 895 F.3d 1191, 1194 (9th Cir. 2018), Olivas-Motta contends that the Board's interpretation of the statute has

expanded the meaning of "moral turpitude" to the point that there is no meaningful standard guiding aliens' conduct.

We are not persuaded that this argument is distinguishable from those rejected in past cases. As we explained in *Leal II*, a crime is morally turpitudinous if it involves a conscious decision and a resulting harm, where "more serious resulting harm is required" "as the level of conscious behavior decreases, i.e., from intentional to reckless conduct." 771 F.3d at 1146 (quoting *Ceron v. Holder*, 747 F.3d 773, 783 (9th Cir. 2014) (en banc)). That is the standard the Board applied to evaluate Arizona felony endangerment, *id.* at 1147, and that standard is sufficiently meaningful to provide fair notice under our precedent. *Martinez-De Ryan*, 895 F.3d at 1193–94. To the extent Olivas-Motta asks us to reconsider those decisions, that is beyond this panel's authority. *Miller*, 335 F.3d at 900.

## VI.

The Board did not commit any of the raised legal errors by concluding that Olivas-Motta's conviction for reckless endangerment was a crime involving moral turpitude. We therefore deny the petition.

**PETITION DENIED.**

WATFORD, Circuit Judge, dissenting:

When a non-citizen is charged with a crime and deciding whether to plead guilty, the immigration consequences of a conviction are often a major consideration. For some defendants, preserving the chance to remain in the United States is more important than the length of any prison sentence that might be imposed. *Padilla v. Kentucky*, 559 U.S. 356, 368 (2010). With that in mind, competent defense counsel "may be able to plea bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce the likelihood of deportation, as by avoiding a conviction for an offense that automatically triggers the removal consequence." *Id.* at 373. Such plea bargains are mutually beneficial for the prosecution: A defendant who might otherwise have proceeded to trial may be persuaded to forgo that right in exchange for a deal that allows him to plead guilty to an offense that reduces the risk of removal. *Id.*

An assessment of the immigration consequences attending a guilty plea must, of course, be based on the law as it exists at the time of the plea. If the law on that subject changes after a defendant pleads guilty, he usually cannot go back and undo his conviction, even if the conviction now carries far more serious immigration consequences than before. For that reason, when there is an intervening change in the law, we are required to assess whether the new rule may be applied retroactively in subsequent removal proceedings.

The majority refuses to engage in that analysis because it concludes that no "new rule" was adopted after Manuel Olivas-Motta pleaded guilty. I respectfully disagree.

The sole issue in Olivas-Motta's removal proceedings is whether reckless endangerment under Arizona Revised Statutes § 13-1201 constitutes a crime involving moral turpitude. When Olivas-Motta pleaded guilty to that offense in 2007, the Board of Immigration Appeals (BIA) had not decided in a precedential opinion whether reckless endangerment should be classified as a crime involving moral turpitude. But in 2012, long after Olivas-Motta pleaded guilty, the BIA held for the first time that reckless endangerment under § 13-1201 *is* a crime involving moral turpitude. *Matter of Leal*, 26 I. & N. Dec. 20, 27 (BIA 2012), *aff'd sub nom. Leal v. Holder*, 771 F.3d 1140 (9th Cir. 2014).

The holding in *Matter of Leal* represents a "new rule" under any definition of that term. The Supreme Court has said that a decision can establish a new rule "either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106 (1971) (citations omitted). The BIA did not overrule past precedent in *Matter of Leal*, but it did resolve an issue of first impression—whether reckless endangerment qualifies as a crime involving moral turpitude. The BIA's resolution of that issue was not clearly foreshadowed by precedent existing at the time Olivas-Motta pleaded guilty. In fact, as discussed below, the BIA's precedent in 2007 suggested that reckless endangerment under § 13-1201 would *not* be classified as a crime involving moral turpitude. Thus, *Matter of Leal* plainly constitutes the "change in law" that the majority identifies as necessary to trigger retroactivity analysis. Maj. op. at 9.

The majority suggests that our case is analogous to one in which a statutory provision is on the books when a

defendant pleads guilty, and a court later does nothing more than construe and apply that statute in the case at hand. Maj. op. at 12. In that scenario, the majority asserts, we would not regard the judicial interpretation as a "new rule" subject to retroactivity analysis.

The majority's assertion would be correct if the court's decision were "dictate[d] by the plain language of the statute." *Harper v. Virginia Department of Taxation*, 509 U.S. 86, 111 (1993) (Kennedy, J., concurring in part and concurring in the judgment) (internal quotation marks omitted). But that is certainly not the case here. The governing statutory standard is supplied by 8 U.S.C. § 1227(a)(2)(A)(ii), which renders a non-citizen removable if he's been convicted of two or more "crimes involving moral turpitude." The quoted phrase has no intelligible meaning; it creates what Justice Jackson rightly labeled "an undefined and undefinable standard." *Jordan v. De George*, 341 U.S. 223, 235 (1951) (Jackson, J., dissenting). Neither our court nor the BIA has been able to come up with "any coherent criteria for determining which crimes fall within that classification and which crimes do not." *Nunez v. Holder*, 594 F.3d 1124, 1130 (9th Cir. 2010). The BIA has been able to give the statutory standard concrete meaning mainly by declaring, through case-by-case adjudications, which specific offenses are covered and which are not. *See Marmolejo-Campos v. Holder*, 558 F.3d 903, 910–11 (9th Cir. 2009) (en banc).

Against that backdrop, each BIA decision that designates a new offense (or class of offenses) as a crime involving moral turpitude potentially creates a "new rule" for retroactivity purposes—at least where, as here, the decision was not clearly foreshadowed by prior precedent. That does not mean retroactive application of all such decisions is

prohibited; it just means that the decisions must be analyzed under the framework we've established for assessing whether retroactive application is permissible.

This case is a prime example of one in which retroactive application of a new rule is impermissible. Olivas-Motta was originally charged in 2007 with attempted murder and aggravated assault with a deadly weapon, offenses that would clearly render him removable if he were convicted. He had already been convicted of one crime involving moral turpitude; he would be subject to removal if convicted of a second, and the BIA had already classified attempted murder and aggravated assault with a deadly weapon as crimes involving moral turpitude. *See Matter of Sanchez-Linn*, 20 I. & N. Dec. 362, 366 (BIA 1991); *Matter of Medina*, 15 I. & N. Dec. 611, 614 (BIA 1976).

Minimizing the likelihood of removal was of paramount concern to Olivas-Motta. He was born in Mexico, but his parents brought him to the United States in 1976 when he was only ten days old. He has lived his entire life in this country as a lawful permanent resident. He is married to a U.S. citizen, and both of his children are U.S. citizens. Most of his family members are also either U.S. citizens or lawful permanent residents. For him, being removed to Mexico would truly be "the equivalent of banishment or exile." *Padilla*, 559 U.S. at 373 (quoting *Delgadillo v. Carmichael*, 332 U.S. 388, 390–91 (1947)).

Although Olivas-Motta believed himself innocent of the charges he faced, he was no doubt "acutely aware" of the severe immigration consequences a conviction would trigger. *INS v. St. Cyr*, 533 U.S. 289, 322 (2001). He therefore had his attorney explore the possibility of pleading guilty to a lesser offense. Olivas-Motta's defense counsel consulted with an experienced immigration lawyer, who

surveyed the law as it then stood. She advised that having Olivas-Motta plead guilty to reckless endangerment under § 13-1201 would minimize the risk of deportation because that offense in all likelihood would *not* be regarded as a crime involving moral turpitude. Olivas-Motta relied on that advice in deciding to plead guilty and forgo his right to a trial.

The advice Olivas-Motta received was sound at the time. The BIA had long held that crimes involving moral turpitude require some form of corrupt or evil intent. *See, e.g.*, *Matter of P—*, 3 I. & N. Dec. 56, 59 (BIA 1947). The BIA retreated from that position in 1976, when it held that certain offenses committed with a *mens rea* of recklessness could qualify as well. *Medina*, 15 I. & N. Dec. at 614. But the Board also made clear that a crime involving reckless conduct is not *per se* a crime involving moral turpitude. *In re Fualaau*, 21 I. & N. Dec. 475, 478 (BIA 1996). Something more was required, although exactly what that something more consisted of remained open to debate. In predicting the likely classification of reckless endangerment, the best guidance came from a series of cases involving manslaughter and assault offenses, which held that a crime committed with a *mens rea* of recklessness had to include as an element some sort of aggravating circumstance, such as the infliction of death or serious bodily injury. *See id.* (serious bodily injury); *Matter of Wojtkow*, 18 I. & N. Dec. 111, 113 (BIA 1981) (death); *Medina*, 15 I. & N. Dec. at 614 (use of a deadly weapon).

As of 2007, the BIA had not issued a precedential decision involving a reckless endangerment offense. Nonetheless, reckless endangerment under Arizona law did not appear to qualify as a crime involving moral turpitude, for although it requires a *mens rea* of recklessness, it does

not require proof of any of the aggravating circumstances found in past cases.  The felony version of the offense, to which Olivas-Motta pleaded guilty, simply requires "recklessly endangering another person with a substantial risk of imminent death."  Ariz. Rev. Stat. § 13-1201(A).  To be sure, there was ongoing debate about whether placing someone in grave risk of death or serious bodily injury could itself be deemed an aggravating circumstance, *see Knapik v. Ashcroft*, 384 F.3d 84, 90 (3d Cir. 2004); *In re Braimllari*, 2006 WL 729794, at *1 (BIA Feb. 14, 2006), but the BIA had rejected that view in two non-precedential decisions, both of which expressly held that reckless endangerment under § 13-1201 did *not* qualify as a crime involving moral turpitude.  *In re Almeraz-Hernandez*, 2006 WL 3203649, at *2–3 (BIA Sept. 6, 2006); *In re Valles-Moreno*, 2006 WL 3922279, at *2–3 (BIA Dec. 27, 2006).

In 2008, however, the Attorney General replaced the BIA's former standard for determining which recklessness offenses qualify as crimes involving moral turpitude with a new standard.  In *Matter of Silva-Trevino*, 24 I. & N. Dec. 687 (A.G. 2008), the Attorney General declared that, to qualify as a crime involving moral turpitude, an offense need involve only "reprehensible conduct and some degree of scienter."  *Id.* at 689 n.1.  The effect of this change was to eliminate the aggravating-circumstance requirement for offenses with a *mens rea* of recklessness.[1]  Under the new

---

[1] The government argues, and the majority appears to agree, that the aggravating-circumstance requirement was limited to assault offenses, and thus did not apply to offenses like reckless endangerment.  Maj. op. at 13–14.  But none of the BIA's cases in this area held that the aggravating-circumstance requirement was limited to assault offenses alone, and there is no logical reason why it would not extend to a comparably serious offense such as reckless endangerment.  Indeed, in each of the pre-*Silva-Trevino* cases in which the BIA held that a reckless

standard, it was now far more likely that reckless endangerment under § 13-1201 would be classified as a crime involving moral turpitude. After all, placing someone in "substantial risk of imminent death" would certainly seem to qualify as reprehensible conduct. And indeed, in 2012, that is exactly what the BIA concluded in *Matter of Leal*, where the agency held for the first time that reckless endangerment under § 13-1201 constitutes a crime involving moral turpitude. 26 I. & N. Dec. at 27.

The question thus becomes whether *Matter of Leal* may be applied retroactively to Olivas-Motta's case—in other words, whether the immigration consequences of his conviction should be assessed under the law as it stood in 2007, when he pleaded guilty, or under the law as it stood in 2014, when the BIA adjudicated his appeal. To answer that question, we apply the test from *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322 (9th Cir. 1982), which requires us to balance five factors: "(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard." *Id.* at 1333 (internal quotation marks omitted).

---

endangerment offense qualified as a crime involving moral turpitude, no one disputed that the aggravating-circumstance requirement applied. The BIA simply concluded in those cases, involving statutes from other States, that the requirement was satisfied. *See Knapik*, 384 F.3d at 90; *Braimllari*, 2006 WL 729794, at *1.

The weight to be accorded the first, fourth, and fifth factors has already been settled.  We have held that the first factor does not favor either party in the immigration context.  *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 520–21 (9th Cir. 2012) (en banc).  The fourth factor strongly favors Olivas-Motta, as the burden imposed by retroactively applying the law in effect in 2014 is severe:  Under the rule adopted in *Matter of Leal*, his conviction for reckless endangerment would be regarded as a crime involving moral turpitude, subjecting him to removal from the United States and separation from his family.  *See id.* at 523.  The fifth factor points in the government's favor, since "non-retroactivity impairs the uniformity of a statutory scheme, and the importance of uniformity in immigration law is well established."  *Id.*

The second and third factors, then, are dispositive, and they tip the balance in Olivas-Motta's favor.  When he pleaded guilty to reckless endangerment in 2007, the BIA had an established standard for determining which recklessness offenses constitute crimes involving moral turpitude.  The Attorney General's subsequent decision in *Silva-Trevino* represented an "abrupt departure" from that standard, *Montgomery Ward*, 691 F.2d at 1333 (internal quotation marks omitted), in the sense that it replaced the aggravating-circumstance requirement with a new, more expansive standard.  That change in the governing standard was outcome determinative with respect to certain offenses, as we know from the way the BIA classified § 13-1201 before and after *Silva-Trevino*.  Before the Attorney General's decision, the BIA had held (in non-precedential decisions) that reckless endangerment under § 13-1201 does not constitute a crime involving moral turpitude; afterward the BIA definitively held exactly the opposite.  Because Olivas-Motta had no reason to anticipate elimination of the

aggravating-circumstance requirement, his reliance on the pre-*Silva-Trevino* standard when deciding to plead guilty was eminently reasonable. *Cf. Garfias-Rodriguez*, 702 F.3d at 521 (second and third factors weigh in favor of retroactive application when the petitioner "could reasonably have anticipated the change in the law such that the new 'requirement would not be a complete surprise'") (quoting *Montgomery Ward*, 691 F.2d at 1333–34).

It's true, as the government argues, that the status of § 13-1201 had not been settled definitively in Olivas-Motta's favor prior to 2008. So this is not a case in which it is 100% clear that Olivas-Motta would have prevailed under the pre-*Silva-Trevino* standard. But, contrary to the majority's apparent assumption, *see* Maj. op. at 14, that is far from fatal under the second and third *Montgomery Ward* factors.

In *Miguel-Miguel v. Gonzales*, 500 F.3d 941 (9th Cir. 2007), we ruled for the petitioner in circumstances quite similar to those present here. When the petitioner in that case pleaded guilty to selling a small amount of cocaine, a relatively minor drug-trafficking offense like his would be classified as a "particularly serious crime" on a case-by-case basis using a multi-factor test. *Id.* at 945–46, 950. After he pleaded guilty, the Attorney General created a new standard that presumed all drug-trafficking offenses to be particularly serious crimes, with the presumption rebuttable only in very narrow circumstances. *Id.* at 946–47. We held that the second and third factors favored the petitioner because at the time he pleaded guilty, there was a "realistic chance" that the BIA would find that his crime was not particularly serious, whereas under the Attorney General's new standard there was "a near (if not total) certainty" that his crime would be

classified as particularly serious, thereby resulting in his removal.  *Id.* at 952; *see also St. Cyr*, 533 U.S. at 321.

Olivas-Motta's situation is no different.  At the time he pleaded guilty, there was *at least* a realistic chance that his reckless endangerment offense would not be classified as a crime involving moral turpitude; the BIA had already so held in two non-precedential decisions.  After the Attorney General's decision in *Silva-Trevino*, however, it was nearly certain that his offense would be classified as a crime involving moral turpitude, and the BIA's decision in *Matter of Leal* soon eliminated what little uncertainty remained on that score.  To the same extent as in *Miguel-Miguel*, the change in the governing standard "attaches new legal consequences to events completed before its enactment," *Vartelas v. Holder*, 566 U.S. 257, 273 (2012) (internal quotation marks omitted), and therefore may not be applied retroactively.

Under the *Montgomery Ward* test, the balance of factors weighs in favor of Olivas-Motta.  Three of the factors favor him—one strongly so—while only one of the factors points in the government's favor.  That means the status of his conviction for reckless endangerment should be analyzed under the law as it stood in 2007, applying the standard that prevailed before the Attorney General's decision in *Silva-Trevino*.  *See id.* at 261.  I would grant Olivas-Motta's petition for review and remand so that the agency can conduct that analysis in the first instance.