## MATTER OF McNAUGHTON

### In Deportation Proceedings

### A-19811498

*Decided by Board July 26, 1978*

(1) A conviction for conspiring to affect the public market in securities with intent to defraud in violation of section 338(2) of the Canadian Criminal Code, a section covering substantially similar conduct to that made criminal in the United States by the Securities Act of 1933 and the Securities Exchange Act of 1934, is a conviction for a crime involving moral turpitude.

(2) Once guilt has been adjudicated by foreign court and the adjudication has not been overturned the Board of Immigration Appeals will not retry guilt.

(3) A foreign conviction, to be the basis for a finding of inadmissibility, must be for conduct which is deemed criminal by United States standards.

(4) Once it has been determined that a foreign conviction is for conduct which is deemed criminal in the United States, prevailing United States standards will be applied to determine whether the crime involves moral turpitude.

(5) Where the conviction is one for conspiracy, moral turpitude is present if the substantive offense to be committed pursuant to the conspiracy involves moral turpitude.

(6) A crime, a necessary element of which is intent to defraud the investing public, involves moral turpitude, and the motivation for the crime does not bear on the nature of the offense.

CHARGE:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)] and 212(a)(9) [8 U.S.C. 1182(a)(9)]—Excludable at time of entry—convicted of a crime involving moral turpitude

ON BEHALF OF RESPONDENT: Stephen Tornay, Esquire
1831 Fourth Avenue
San Diego, California 92101

BY: Milhollan, Chairman; Maniatis, Appleman, Maguire, and Farb, Board Members

This is an appeal from the immigration judge's decision of October 13, 1977, in which he found the respondent deportable as charged. The appeal will be dismissed.

The record relates to a widowed male alien, a native and citizen of the United Kingdom, who was last admitted to the United States on June 5, 1977, as a nonimmigrant visitor. He is charged with deportability under

section 241(a)(1) of the Immigration and Nationality Act, 8 U.S.C. 1251(a)(1), on the basis that he was excludable at the time of entry under section 212(a)(9) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(9), because of the conviction of a crime involving moral turpitude.

A copy of the respondent's record of conviction is in our record. It indicates that the Quebec Court of Sessions for the District of Montreal found him guilty of conspiracy to commit a violation of section 338(2) of the Canadian Criminal Code, which provides as follows:

> Every one who, by deceit, falsehood or other fraudulent means, whether or not it is a false pretense within the meaning of this Act, with intent to defraud, affects the public market price of stocks, shares, merchandise or anything that is offered for sale to the public, is guilty of an indictable offense and is liable to imprisonment for ten years.

The finding of guilt was affirmed by the Court of Appeals for the Province of Quebec, but that court substantially reduced the respondent's sentence.

Opinions were written in the respondent's case by each of the three members of the Quebec Court of Appeals, as well as by the trial judge. Copies of these opinions are before us. We learn from them that the respondent's conviction arose out of his participation in a mining stock deal. He agreed with certain other investors to operate what is known in Quebec as a "box." An explanation of the use of the "box" may be found in the following excerpt from the opinion of Judge Turgeon of the Court of Appeals:

> At the period which concerns us, let's say 1971, it was common practice in Montreal at the Canadian Stock Exchange, for the promotion of new mining or industrial stock, to have a means for assuring a well-regulated market in terms of its quoted worth at the Exchange, for the purpose of preventing disorderly and excessive fluctuations to the low or the high side. For this purpose, the promoters used, what was convenient to call in the brokerage, a "box" which I will translate as "boite" (box), for lack of a better word. For this purpose, the operator of the box, who could be a broker or a mere individual, had to have at his disposal a certain number of the company's shares and a certain amount of money. When the price of the stock, or rather of the transferable security, rose in an excessive manner due to a large demand, the operator of the box would sell part of the shares he had in his possession on the market by means of the Exchange. Conversely, when the quoted price of the shares fell in an unwarranted manner because of too large a number of shares offered for sale, the operator of the box would buy some of these shares at the Exchange in order to stabilize the market. One should note here that, in terms of the common usage of the Exchange, the box should not serve to enrich the person or people who operate it: its role was essentially to assure "an orderly market". This manner of operation was at least tolerated by the Canadian Stock Exchange which asked of its promoters of securities that they run an orderly market for their shares.

It was found that the "box" involved in the respondent's case was used to enrich its operators, rather than to assure an orderly market. The respondent's co-conspirators, it was found, manipulated the "box"

for their own profit, with his knowledge, although the respondent did not profit personally from the operation of the "box."

During the criminal proceedings the respondent maintained his innocence on the basis that he had had no knowledge that the "box" was being operated other than to stabilize the market. However, the trial judge and the Court of Appeals found that he must have known the "box" was actually being operated to enrich some of its operators.

Alternatively, he argued that operation of the "box" for the profit of its operators was not a violation of the Canadian statute, but was a permissible practice. This defense likewise was rejected. Despite the absence of precedent on the point, the Canadian courts found that the practice was a violation of the law, and that the respondent should have known it to be.

The respondent makes three arguments as to why the conviction should not form the basis for his deportation. First, he argues that he was not guilty of the offense of which he was convicted. Second, he argues that the conduct which formed the basis of his conviction in Canada would not constitute a criminal offense in the United States. Third, he argues that the crime of which he was convicted in Canada is not a crime of moral turpitude, a necessary element of the ground of deportability with which he is charged.

As to the respondent's guilt or innocence of the offense of which he was convicted, his guilt has been adjudicated by the courts in Canada with criminal jurisdiction. It is not our place to retry that issue. *Brice v. Pickett*, 515 F.2d 153 (9 Cir. 1975); *Mylius v. Uhl*, 210 F. 860 (2 Cir. 1914); *Matter of Fortis*, 14 I. & N. Dec. 576 (BIA 1974); *Matter of Sirhan*, 13 I. & N. Dec. 592, 594 (BIA 1970). The respondent must address any attack on the merits of the conviction to the courts with criminal jurisdiction. The respondent advises that he has uncovered evidence that testimony against him at his trial was perjured, and that he has requested an investigation by the Quebec authorities. To date, however, so far as we are aware, the respondent's conviction remains in force.

The respondent next argues that his conviction was for conduct which would not constitute a crime in the United States. A description of the conduct found criminal is provided in the decisions of the trial and appellate judges. It was found that the "box," through the use of dummy corporations controlled by its operators, made sales to itself which appeared on the Montreal Exchange as arm's-length transactions. These sales were made when the price of the stock was increasing. Often the sales by the "box" to itself were the last purchases of the day, at a price higher than the next to last sale for the day. These sales had the effect of creating an appearance that the price was rising. The trial court concluded that: "the box's sole aim was profit to the operators of the box

571

and to create an artificial volume of shares bought and sold on the market." This manipulation of the "box" was contrary to the tolerated use of the "box" for the promotion of an orderly market.

It was noted in the decisions that the respondent's participation in the "box" was limited. The actual manipulations were done by the respondent's co-conspirators, and as stated above, the respondent did not profit personally. However, it was found that the respondent had knowledge of the way in which the "box" was being operated inasmuch as he had financial control of one of the companies through which the "box" operated, because he was kept informed of all the transactions involved, and because he must have noticed that the value of the shares rose unceasingly for a certain period. The respondent was convicted on the basis of the finding that he possessed knowledge of the operations of the "box." His motives were described as arising from a desire to please one of the investors, a Mr. Eckersley, who was president of a charitable foundation which distributed funds for the purpose of medical research. The respondent, who was himself president of a cancer research foundation, hoped to receive generous gifts from the latter's foundation for the two foundations with which the respondent was associated. (Opinion of Judge Turgeon, Court of Appeals of Quebec, pp. 14, 18.)

The respondent is correct in his argument that when a foreign conviction is the basis for a finding of inadmissibility, the conviction must be for conduct which is deemed criminal by United States standards. It is a necessary element that the act underlying the conviction be something forbidden by United States law, 37 Op. Att'y Gen. 293 (1933).

Counsel cites the case of *United States* v. *Brown*, 5 F. Supp. 81 (S.D. N.Y. 1933) for the proposition that identical conduct in the United States would not be considered a crime.[1] The case actually stands for the contrary proposition. The United States securities laws contain two offenses which bear substantial similarity to the Canadian statute involved. Under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b):

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Under section 17(a) of the Securities Act of 1933, 15 U.S.C. 77q(a):

> It shall be unlawful for any person in the offer or sale of any securities by the use of

---

[1] We could not find in the cited decision the language which is quoted in the brief as a quotation from that case.

any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud. . . .

A violation of 15 U.S.C. 78j(b) was found by the Supreme Court in a case in which a corporation's assets were used to acquire shares of its own stock. *Supt. of Insurance of New York v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1971). In *Securities and Exchange Com'n v. Commonwealth Sec., Inc.*, 410 F. Supp. 1002 (S.D. N.Y. 1976), the District Court for the Southern District of New York found a violation of both of the above sections because of self dealing. In the latter case, the defendants misused their dominant market position to manipulate trading and inflate the price of certain securities artificially for their own gain. The following statement appears in the decision:

> In a free and open public market, it is the competing judgments of numerous buyers and sellers at an auction which establishes the fair price of a security. When individuals, occupying a dominant market position, undertake a scheme to distort the price of a security for their own gain, they violate the securities law by perpetrating a fraud on all public investors.

The conduct discussed in *Securities and Exchange Com'n v. Commonwealth Sec., Inc., supra*, appears to be very similar in type to the conduct for which the respondent was convicted. Like the defendants in *Securities and Exchange Com'n v. Commonwealth Sec., Inc., supra*, he was in a dominant market position, and he was involved in a scheme to distort the price of securities through rigged purchases by controlled accounts. Thus, it appears that the conduct of which the respondent was convicted would constitute a criminal violation in the United States. Therefore, judged by United States standards, the Canadian conviction is for conduct which is prohibited in the United States.

Having established that the conduct would be adjudged criminal by our standards, however, is not the end of our inquiry. We are left with the question of determining whether the crime involved moral turpitude. We look, as counsel urges, to prevailing United States standards in making this determination. 39 Op. Att'y Gen. 95, 96 (1937); 39 Op. Att'y Gen. 215, 220 (1938); 37 Op. Att'y Gen. 293 (1933), *supra*; *Matter of P—*, 6 I. & N. Dec. 400, 403 (BIA 1954); *Matter of P—*, 3 I. & N. Dec. 56 (CO 1947, BIA 1948). The Canadian statute involved,[2] and the record of conviction serve as a guide in this inquiry. The Canadian statute has been quoted above. From the record of conviction we have

---

[2] Here the respondent was convicted of the crime of conspiracy. Whether a conspiracy involves moral turpitude depends upon whether the offense to be committed pursuant to the conspiracy involves moral turpitude, *Matter of P—*, 3 I. & N. Dec. 56 (CO 1947, BIA 1948). Conspiracy to commit an offense does not involve moral turpitude unless the substantive offense charged therein involves moral turpitude, *Matter of G—*, 7 I. & N. Dec. 114, 115 (BIA 1956); *Hirsch v. INS*, 308 F.2d 562 (9 Cir. 1962).

the verdict and sentencing opinions by the trial court and the Quebec Court of Appeals.

The specific conduct which was found to be criminal in the respondent's case was the manipulation of the "box" in such a way as to give the appearance to the public that bona fide sales of the stock were being made at higher prices than was actually the case. This had the effect of artificially raising the price of the stock for the benefit of the operators of the "box," and to the detriment of the investing public. As described above in the quotation from *Securities and Exchange Com'n v. Commonwealth Sec., Inc., supra,* a violation of the securities law in this manner is deemed a fraud on the public.

Fraud has, as a general rule, been held to involve moral turpitude, *Jordan v. DeGeorge,* 341 U.S. 223 (1951) (defrauding the United States of taxes on distilled spirits); *Mercer v. Lance,* 96 F.2d 122 (10 Cir. 1938) (defrauding a person of a large sum of money); *U.S. ex rel. Berlandi v. Reimer,* 30 F. Supp. 767 (S.D. N.Y. 1939), aff'd 113 F.2d 429 (2 Cir. 1940) (defrauding the United States of taxes on distilled spirits); *U.S. ex rel. Amato v. Commissioner of Immigration Ellis Island, New York Harbor,* 18 F. Supp. 480 (S.D. N.Y. 1937) (petty larceny); *U.S. ex rel. Portada v. Day,* 16 F.2d 328 (S.D. N.Y. 1926) (issuing of checks without sufficient funds, with intent to defraud); *Ponzi v. Ward,* 7 F. Supp. 736 (D. Mass. 1934) (use of the mails to defraud); *Matter of Martinez,* Interim Decision 2611 (BIA 1977) (passing counterfeit money); *Matter of P—,* 3 I. & N. Dec. 56 (CO 1947, BIA 1948) (obtaining money by false pretenses); *Matter of F—,* 2 I. & N. Dec. 754 (CO 1947, BIA 1948) (defrauding government of customs duties).

From these cases it can be seen that whenever a crime has involved intent to defraud, it has been found to involve moral turpitude. The crime of which the respondent was convicted included "intent to defraud" as an element necessary for conviction. The fraud was committed against the investing public as a whole. The number of potential victims, therefore, was very large.

Moral turpitude, which is a vague term, has been described as anything done contrary to justice, honesty, principle, or good morals; conduct contrary to the accepted and customary rule of right and duty owed between man and man, either one's fellowman or society in general, 37 Op. Att'y Gen., *supra, Matter of P—,* 6 I. & N. Dec. 400 at 403. Deceptive practices engaged in to affect the public market price of stocks or shares at the expense of the investing public certainly violates the customary rule of right and duty owed between man and man in relation to society in general. Intent to defraud the investing public, which is an entire segment of society, is at least as heinous as intent to defraud an individual or the Government (who were the victims of the cases involving fraud listed above).

A purpose common to the securities acts was the goal of substituting for the philosophy of caveat emptor a level of business practices more consonant with what was believed to be morally acceptable, *SEC* v. *Capital Gains Research Bureau*, 375 U.S. 180, 194 (1963). It was felt that public policy could no longer tolerate certain practices. The fact that the criminal prohibition of the practices is fairly recent in origin does not detract from the inherent immorality of the acts. As stated in *Rudolph* v. *United States*, 6 F.2d 487 (D.C. Cir. 1925) (and quoted with approval in 39 Op. Att'y Gen. 215, *supra*, at 221):

> Many things which were not considered criminal in the past have, with the advancement of civilization, been declared such by statute; and the commission of the offense if it involves the violation of a rule of public policy and morals, is such an act as may involve moral turpitude.

We are not unaware of the sympathetic aspects of the respondent's case, which prompted the Quebec Appeals Court to reduce his sentence. The respondent's motivation, naivete, and ignorance of the law, however, do not bear on the nature of the crime itself, which must be the test of whether it involves moral turpitude.

The Supreme Court observed in *Jordan* v. *DeGeorge, supra*, that in every deportation case where fraud has been proved, Federal courts have held that the crime at issue involved moral turpitude. After observing:

> [I]t can be concluded that fraud has consistently been regarded as such a contaminating component in any crime that American courts have without exception, included such crimes within the scope of moral turpitude,

the Court found the crime of conspiring to defraud the United States to be a crime involving moral turpitude. We see no reason to depart from the direction there laid down. We find the crime of conspiring to defraud the investing public to be a crime involving moral turpitude.

**ORDER:** The appeal is dismissed.