**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ANTONIO ISLAS-VELOZ, AKA Antonio Islas, *Petitioner*, v. MATTHEW G. WHITAKER, Acting Attorney General, *Respondent*. | No. 15-73120 Agency No. A060-299-672 OPINION |

On Petition for Review of an Order of the Board of Immigration Appeals

Submitted August 27, 2018[*] Seattle, Washington

Filed February 4, 2019

Before: Michael Daly Hawkins, M. Margaret McKeown, and William A. Fletcher, Circuit Judges.

Opinion by Judge McKeown; Concurrence by Judge W. Fletcher

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Immigration

Denying Antonio Islas-Veloz's petition for review of a decision of the Board of Immigration Appeals, the panel held that Supreme Court and circuit precedent required rejecting Islas-Veloz's contentions that: 1) the phrase "crime involving moral turpitude" was unconstitutionally vague; and 2) his conviction for communication with a minor for immoral purposes in violation of Revised Code of Washington § 9.68A.090 is not categorically a crime of moral turpitude.

The panel concluded that, in assessing the constitutional status of the phrase "crime involving moral turpitude," it remains bound by the Supreme Court's decision in *Jordan v. De George*, 341 U.S. 223 (1951), in which the Court held that the phrase "crime involving moral turpitude" was not unconstitutionally vague. The panel also explained that Court's more recent decisions in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), did not reopen inquiry into the constitutionality of the phrase. The panel further observed that this court has repeatedly echoed the holding in *De George*, noting that the court recently held in *Martinez-De Ryan v. Sessions*, 895 F.3d 1191 (9th Cir. 2018), that the phrase is not unconstitutionally vague.

The panel also concluded that this court's precedent foreclosed Islas-Veloz's alternate claim that his conviction

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

for communicating with a minor for immoral purposes is not a crime of moral turpitude.

Concurring, Judge W. Fletcher wrote that the Supreme Court's recent decisions in *Johnson* and *Dimaya* should lead the panel, were it not bound by this court's precedent in *Martinez-De Ryan*, to conclude that the phrase "crime of moral turpitude" is unconstitutionally vague when used as a basis for the removal of a noncitizen. Observing that this circuit acknowledges a distinction between fraud and non-fraud crimes involving moral turpitude, Judge W. Fletcher wrote that non-fraud cases comprise the great bulk of crimes involving moral turpitude today and that the definition of non-fraud crimes involving moral turpitude is hopelessly and irredeemably vague.

## COUNSEL

Manuel Rios, Rios & Cruz P.S., Seattle, Washington, for Petitioner.

Laura M.L. Maroldy, Trial Attorney; John S. Hogan, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

McKEOWN, Circuit Judge:

Antonio Islas-Veloz petitions for review of a final order of removal following the dismissal of his appeal by the Board of Immigration Appeals ("BIA").  We conclude that Supreme Court and circuit precedents require us to deny the petition.

Islas-Veloz was convicted of communication with a minor for immoral purposes in violation of Revised Code of Washington ("RCW") § 9.68A.090.  An immigration judge found that Islas-Veloz's conviction constituted a crime involving moral turpitude committed within five years of admission to the United States and found him removable on that basis.  *See* 8 U.S.C. § 1227(a)(2)(A)(i). The BIA dismissed Islas-Veloz's appeal, ruling that communication with a minor for immoral purposes in violation of RCW § 9.68A.090 was categorically a crime involving moral turpitude.

Islas-Veloz argues that the phrase "crime involving moral turpitude" is unconstitutionally vague in light of the Supreme Court's decisions in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).  In the alternative, he claims that the crime of "communication with [a] minor for immoral purposes" in violation of RCW § 9.68A.090 is not categorically a crime of moral turpitude, and hence that his final order of removal is invalid.

In assessing the constitutional status of the phrase "crime involving moral turpitude," we remain bound by the Supreme Court's decision in *Jordan v. De George*, 341 U.S. 223 (1951).  In *De George*, the Court held that the phrase "crime

involving moral turpitude" was not unconstitutionally vague. *Id.* at 231–32. The Court's more recent decisions in *Johnson* and *Dimaya* did not reopen inquiry into the constitutionality of the phrase. Notably, *Dimaya* acknowledged that the Court in *De George* had "ultimately uph[e]ld" the phrase "crime involving moral turpitude" against an unconstitutional vagueness attack. *Dimaya*, 138 S. Ct. at 1213.

We have repeatedly echoed the holding that the Supreme Court laid down in *De George*. In *Tseung Chu v. Cornell*, we cited *De George* in ruling that the phrase "crime involving moral turpitude" was constitutional. 247 F.2d 929, 938–39 (9th Cir. 1957). More recently, in *Martinez-De Ryan v. Sessions*, we again held that the phrase is not unconstitutionally vague. 895 F.3d 1191, 1194 (9th Cir. 2018); *see also Olivas-Motta v. Whitaker*, 910 F.3d 1271, 1281 (9th Cir. 2018). *De Ryan* explicitly addressed *Sessions v. Dimaya*, explaining that the Supreme Court's opinion in that case did not change the constitutional status of the phrase. *See* 895 F.3d at 1193–94. As the concurrence acknowledges, our precedent cannot be read differently.

Islas-Veloz's alternate claim that communicating with a minor for immoral purposes is not a crime of moral turpitude is foreclosed by our decision in *Morales v. Gonzales*, 478 F.3d 972 (9th Cir. 2007), *abrogated on other grounds in Anaya-Ortiz v. Holder*, 594 F.3d 673, 677–78 (9th Cir. 2010). In *Morales*, we "conclude[d] that [a] conviction for communication with a minor for immoral purposes" constitutes a crime of moral turpitude. *Id.* at 978. We elaborated: "The full range of conduct prohibited by section 9.68A.090 of the Revised Code of Washington categorically constitutes a crime involving moral turpitude." *Id.*

Apart from any ongoing debate about the degree of ambiguity inherent in the phrase "crime involving moral turpitude," these precedents are directly on point, bind us here, and foreclose Islas-Veloz's arguments.

**PETITION DENIED.**

W. FLETCHER, Circuit Judge, concurring:

We are bound by our court's precedent in *Martinez-De Ryan v. Whitaker*, 909 F.3d 247 (9th Cir. 2018), and I therefore concur in the panel's opinion. However, I write separately because the Supreme Court's recent decisions in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), should lead us, were we not bound, to conclude that the phrase "crime of moral turpitude" is unconstitutionally vague when used as the basis for removal of a noncitizen. *See* 8 U.S.C. § 1227(a)(2)(A)(i)-(ii).

## I. "Moral Turpitude" in Immigration Law

The Immigration and Nationality Act ("INA") imposes severe penalties on noncitizens convicted of a "crime involving moral turpitude" ("CIMT"). *See* 8 U.S.C. §§ 1182(a)(2)(A) (inadmissibility), 1227(a)(2)(A)(i)-(ii) (removal), 1229b(b)(1)(C) (ineligibility for cancellation of removal and adjustment of status). Section 1227(a)(2)(A)(i)–(ii) renders removable any noncitizen who is (a) convicted of a "crime involving moral turpitude" within five years of entry for which a sentence of one year or more is imposed or, (b) convicted of any two "crimes involving

moral turpitude" at any time after entry, regardless of sentence length or type.  The noncitizen is also ineligible for cancellation of removal.    8 U.S.C. § 1229b(b)(1)(C).  "[R]emoval is a virtual certainty" no matter how long an individual may have previously resided in the United States.  *Dimaya*, 138 S. Ct. at 1211.

In recent years, the United States has deported many tens of thousands of noncitizens under § 1227(a)(2)(A) after having been convicted of CIMTs.  *See* Transactional Records Access Clearinghouse, *Individuals Charged with Moral Turpitude in Immigration Court*, SYRACUSE UNIV. (last accessed Dec. 21, 2018), http://trac.syr.edu/immigration/reports/moral_turp.html (collecting data that shows that from 1996-2006 the United States brought removal proceedings against over 135,000 noncitizens for "crimes involving moral turpitude"); Transactional Records Access Clearinghouse, *Immigration Court Post-Trump Cases: Latest Data*, SYRACUSE UNIV., tbl. 6 (March 21, 2017), http://trac.syr.edu/immigration/reports/462/ (collecting data from 2012 to 2017).

The term "moral turpitude" first appeared in federal immigration law in 1891, when Congress barred entry to persons "who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude."  Act of Mar. 3, 1891, ch. 551, 26 Stat. 1084.  Sixteen years later, "Congress expanded the class of excluded persons to include individuals who 'admit' to having committed a crime of moral turpitude."  *Padilla v. Kentucky*, 559 U.S. 356, 361 n.2 (2010) (citing Act of Feb. 20, 1907, ch. 1134, § 2, 34 Stat. 899.).    Ten years later, in the Immigration Act of 1917, Congress "rendered deportable" noncitizens who are "sentenced to imprisonment for a term of one year or more

because of conviction in this country of a crime involving moral turpitude, committed within five years" of entry and "noncitizen recidivists who commit two or more crimes of moral turpitude at any time after entry." *Id.* at 361 (citing Immigration Act of 1917, ch. 29, §19, 39 Stat. 889). The INA, enacted in 1952 and amended thereafter, included these same penalties. In none of those statutes has Congress defined the term "moral turpitude." *Id.*

## II. Void for Vagueness

In two recent cases, the Supreme Court has revitalized the void-for-vagueness doctrine in both criminal and civil cases.

First, in *Johnson v. United States*, 135 S. Ct. 2551 (2015), the Court upheld a vagueness challenge to a provision of the Armed Career Criminal Act ("ACCA"). Federal criminal law prohibits convicted felons from possessing firearms. 18 U.S.C. § 922(g). If a felon convicted under § 922(g) has previously been convicted of three or more "serious drug offenses" or "violent felonies," the ACCA increases the prison term by a minimum of fifteen years and a maximum of life. *Id.* at § 924(e)(1). The ACCA defines "violent felony" as a crime punishable by a term exceeding a year that (i) either has as an element the actual, attempted or threatened use of force or (ii) "is burglary, arson, or extortion, involves the use of explosives, *or otherwise involves conduct that presents a serious risk of physical injury to another*." *Id.* at § 924(e)(2)(B) (emphasis added). The italicized language is the ACCA's "residual clause."

In an opinion by Justice Scalia, the Court held the residual clause unconstitutionally vague. The Court wrote, "Two features of the residual clause conspire to make it

unconstitutionally vague." *Johnson*, 135 S. Ct. at 2557. First, the clause "leaves grave uncertainty about how to estimate the risk posed by a crime." *Id*. Second, the clause "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2558. The combination produced "more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.* at 2557.

The Court described, and lamented, four recent cases in which it had reached disparate results under the ACCA residual clause: "[T]his Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminancy." *Id.* at 2558. The Court pointed out that, in addition to its own disparate results, the residual clause had "'created numerous splits among the lower federal courts,' where it has proved 'nearly impossible to apply consistently.'" *Id.* at 2559–60 (quoting *Chambers v. United States*, 555 U.S. 122, 133 (2009) (Alito, J., concurring in judgment)). The Court concluded:

> Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise. . . . Invoking so shapeless a provision to condemn someone to prison for fifteen years to life does not comport with the Constitution's guarantee of due process.

*Id.* at 2560.

Second, in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), the Court upheld a vagueness challenge to a provision of the INA. The INA renders deportable (or "removable") a

noncitizen convicted of an "aggravated felony" committed after entering the United States. 8 U.S.C. § 1227(a)(2)(A)(iii). The noncitizen is also ineligible, by virtue of the aggravated felony, for cancellation of removal. *See id.* §§ 1229b(a)(3), (b)(1)(C). The INA defines "aggravated felony" to include a felony "that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 8 U.S.C. § 16(b). The language just quoted is the INA's "residual clause."

Justice Kagan, writing for the Court, held the INA's residual clause unconstitutionally vague: "Section 16's residual clause violates [the] promise [of the due process clause] in just the same way" as the residual clause of the ACCA held unconstitutional in *Johnson*. *Dimaya*, 138 S. Ct. at 1215. "The result is that § 16(b) produces, just as ACCA's residual clause did, 'more unpredictability and arbitrariness than the Due Process Clause tolerates.'" *Id.* at 1216 (quoting *Johnson*, 135 S. Ct. at 2558).

Writing for a plurality of four, Justice Kagan acknowledged that "removal of an alien is a civil matter." *Id.* at 1213. She nonetheless applied the same test to the INA the Court had applied to the ACCA in *Johnson*. "[W]e long ago held that the most exacting vagueness standard should apply in removal cases." *Id.* (citing *Jordan v. De George*, 341 U.S. 223, 229 (1951)). She continued, "Nothing in the ensuing years calls that reasoning into question. To the contrary, this Court has reiterated that deportation is 'a particularly severe penalty,' which may be of greater concern to a convicted alien than 'any potential jail sentence.'" *Id.* (quoting *Jae Lee v. United States*, 137 S. Ct. 1958, 1968 (2017)). Justice Gorsuch did not join the portion of Justice Kagan's opinion

justifying the application of the "most exacting vagueness standard" in removal cases. He wrote separately, agreeing that the "exacting vagueness standard" should apply in removal cases, but indicating he would apply it in civil cases more broadly. *Id.* at 1231 (Gorsuch, J., concurring). Combining Justice Kagan's and Justice Gorsuch's opinions, a majority of the Court concluded that the "exacting vagueness standard" applicable in criminal cases applies, at the very least, in removal cases under the INA.

## III. Vagueness of "Crime Involving Moral Turpitude"

### A. *Jordan v. De George*

Almost seventy years ago in *Jordan v. De George*, 341 U.S. 223 (1951), the Supreme Court upheld a deportation order under the Immigration Act of 1917, based on convictions for crimes involving moral turpitude. De George was an Italian citizen who had lived continuously in the United States for twenty-nine years, and who had been twice convicted of fraudulently avoiding federal taxes on "distilled spirits." *De George*, 341 U.S. at 224–25. The Court of Appeals for the Seventh Circuit held that tax fraud was not a CIMT and set aside the deportation order. *Id.* at 226. The Supreme Court reversed, holding that fraud was a CIMT and upholding the deportation.

The Court wrote that "[t]he question of vagueness was not raised by the parties nor argued before this Court," *id.* at 229, but it addressed the question anyway, in response to three dissenting justices. The Court noted that it had previously upheld a deportation order premised on a conviction for a CIMT when the noncitizen had been convicted of counterfeiting with an intent to defraud. *See United States ex*

*rel. Volpe v. Smith*, 289 U.S. 422 (1933).　　The Court emphasized that the deportation at issue in the case before it, as in *Volpe*, was based on a conviction for fraud:

> Fraud is the touchstone by which this case should be judged.　　The phrase "crime involving moral turpitude" has without exception been construed to embrace fraudulent conduct.　　We therefore decide that Congress sufficiently forewarned respondent that the statutory consequence of twice conspiring to defraud the United States is deportation.

*Id*. at 232.

The Court wrote that there might be some "marginal offenses" or "peripheral cases" that might (or might not) be encompassed within the phrase "crimes involving moral turpitude."　　*Id.* at 231–32.　　However, "difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness." *Id*. at 231.　"Whatever else the phrase 'crime involving moral turpitude' may mean in peripheral cases, the decided cases make it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude." *Id.* at 232.

Justice Jackson, joined by Justices Black and Frankfurter, dissented.　He wrote, "What the Government seeks, and what the Court cannot give, is a basic definition of 'moral turpitude' to guide administrators and lower courts." *Id.* at 233 (Jackson, J., dissenting).　He continued:

Congress did not see fit to state what meaning it attributes to the phrase "crime involving moral turpitude." It is not one which has settled significance from being words of art in the profession. If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity and moral turpitude seems to mean little more than morally immoral. The Government confesses that it is a "term that is not clearly defined," and says: "The various definitions of moral turpitude provide no exact test by which we can classify the specific offenses here involved.

Except for the Court's opinion, there appears to be universal recognition that we have here an undefined and undefinable standard.

*Id.* at 234–35.

### B. Void for Vagueness

### 1. Questions Today

There are two questions before us today, almost seventy years after the Court's decision in *De George*.

First, the Court in *De George* concluded that the only cases in which the meaning of "crime involving moral turpitude" might have been impermissibly vague were

"marginal offenses" or "peripheral cases." Whether at the time *De George* was decided such cases were, in fact, merely "marginal" or "peripheral," I need not consider. The question today is whether non-fraud cases are still so few—so marginal or peripheral—that they need not concern us.

Second, the Court in *De George* did not quarrel with Justice Jackson's conclusion that the definition of "crimes involving moral turpitude" in non-fraud cases was unconstitutionally vague. The question today is whether, in the time since the Court's decision in *De George*, judicial construction has clarified the definition in non-fraud cases.

The answer to both questions is clear. Non-fraud CIMTs today are neither marginal nor peripheral, and the definition of non-fraud CIMTs is as vague today as it was in 1951.

## 2. The Reality Today

Our circuit acknowledges the distinction between fraud and non-fraud cases, dividing CIMTs into two categories, "'those involving fraud and those involving grave acts of baseness or depravity.'" *Marmolejo-Campos v. Holder*, 558 F.3d 903, 910 (9th Cir. 2009) (en banc) (quoting *Carty v. Ashcroft*, 395 F.3d 1081, 1083 (9th Cir. 2005); *see also, e.g.*, *Menendez v. Whitaker*, 908 F.3d 467, 472–73 (9th Cir. 2018) ("We have traditionally identified two different types of crimes involving moral turpitude: 'those involving fraud and those involving grave acts of baseness or depravity.'" (quoting *Carty*, 395 F.3d at 1083)); *Mancilla-Delafuente v. Lynch*, 804 F.3d 1262, 1265 (9th Cir. 2015) ("There are two types of possible CIMTs: those involving fraud and those involving grave acts of baseness or depravity." (internal quotation omitted)); *Robles-Urrea v. Holder*, 678 F.3d 702,

708 (9th Cir. 2012) ("Such crimes are of two types: those involving fraud and those involving grave acts of baseness or depravity.").

Our sister circuits and the Board of Immigration Appeals ("BIA") consistently define moral turpitude as conduct that is "base, vile, and depraved," and recognize that fraud is always a CIMT. *See, e.g.*, *Chiao Fang Ku v. Attorney Gen. United States of Am.*, 912 F.3d 133 (3d Cir. 2019) ("Courts have long treated fraud crimes as 'involving moral turpitude.'" (citing *De George*, 341 U.S. at 232)); *Pierre v. U.S. Attorney Gen.*, 879 F.3d 1241, 1251 (11th Cir. 2018) ("Whether a crime involves the depravity or fraud necessary to be one of moral turpitude depends upon the inherent nature of the offense . . . ." (internal citations omitted)); *Guevara-Solorzano v. Sessions*, 891 F.3d 125, 135 (4th Cir. 2018) ("A CIMT is a crime that is 'inherently base, vile, or depraved,' meaning that it involves conduct 'that not only violates a statute but also independently violates a moral norm.'" (citation omitted)); *Baptiste v. Attorney Gen.*, 841 F.3d 601, 621 (3d Cir. 2016) (defining morally turpitudinous conduct as "inherently base, vile, or depraved, contrary to the accepted rules of morality and the duties owed other persons" (citation omitted)); *Arias v. Lynch*, 834 F.3d 823, 826 (7th Cir. 2016) ("The Board has defined a crime involving moral turpitude as 'conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.' We have adopted definitions substantively in line with the Board's." (internal citation omitted)); *Mejia v. Holder*, 756 F.3d 64, 68 (1st Cir. 2014) (defining CIMT as "conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed

between persons or to society in general" (citation omitted)); *Efstathiadis v. Holder*, 752 F.3d 591, 595 (2d Cir. 2014) ("Whether a prior conviction constitutes a CIMT turns on whether the crime is 'inherently base, vile, or depraved.'" (citation omitted)); *Yeremin v. Holder*, 738 F.3d 708, 714 (6th Cir. 2013) ("The term 'refers generally to conduct that is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.' . . . Crimes that involve deception or fraud consistently are held to qualify as crimes involving moral turpitude." (citation omitted)); *Marin-Rodriguez v. Holder*, 710 F.3d 734, 738 (7th Cir. 2013) ("Crimes entailing an intent to deceive or defraud are unquestionably morally turpitudinous."); *Rodriguez-Heredia v. Holder*, 639 F.3d 1264, 1268 (10th Cir. 2011) ("Although 'crime involving moral turpitude' is not defined by statute, we have said that 'moral turpitude refers to conduct which is inherently base, vile, or depraved, contrary to the accepted rules of morality and the duties owed between man and man, either one's fellow man or society in general.' Applying this concept, we have followed Supreme Court precedent making it 'plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude.'" (internal citations omitted)); *Guardado-Garcia v. Holder*, 615 F.3d 900, 902 (8th Cir. 2010) ("Crimes involving moral turpitude have been held to require conduct 'that is inherently base, vile, or depraved, and contrary to accepted rules of morality and the duties owed between persons or to society in general.' 'Crimes involving the intent to deceive or defraud are generally considered to involve moral turpitude.' (internal citations omitted)); *Hyder v. Keisler*, 506 F.3d 388, 391 (5th Cir. 2007) ("'Moral turpitude refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality

and the duties owed between persons or to society in general.'
. . . We have repeatedly emphasized that crimes whose
essential elements involve fraud or deception tend to be
CIMTs." (internal citations omitted)); *Matter of Zaragoza-*
*Vaquero*, 26 I. & N. Dec. 814, 815–16 (BIA 2016) ("Moral
turpitude refers generally to conduct that shocks the public
conscience as being inherently base, vile, or depraved, and
contrary to accepted rules of morality and the duties owed
between persons or to society in general. . . . Crimes that
require intent to defraud are [] crimes involving moral
turpitude."); *Matter of Flores*, 17 I. & N. Dec. 225, 227–28
(BIA 1980) ("Moral turpitude is a nebulous concept which
refers generally to conduct which is inherently base, vile, or
depraved, contrary to the accepted rules of morality and the
duties owed between man and man, either one's fellow man
or society in general. . . . The most frequently cited definition
of moral turpitude was given by the Supreme Court in *Jordan*
*v. DeGeorge*, 341 U.S. 223, 232 (1951), where it was stated:
'Whatever else the phrase crime involving moral turpitude
may mean in peripheral cases, the decided cases make it
plain that crimes in which fraud was an ingredient have
always been regarded as involving moral turpitude.'"); *Matter*
*of E-----*, 2 I & N Dec. 134, 140 (BIA 1944) ("[A] crime
involves moral turpitude when its nature is such that it
manifests upon the part of its perpetrator personal depravity
or baseness.").

   If CIMTs were restricted to fraud, there would be no
constitutional difficulty.  But in the decades since *De George*
was decided, courts and administrators significantly expanded
the conduct that qualifies as "base, vile, or depraved" and,
therefore, "morally turpitudious."  Far from being marginal
or peripheral, non-fraud cases comprise the great bulk of

CIMTs today. Further, the definition of non-fraud CIMTs is hopelessly and irredeemably vague.

In a recent law review article, Professor Simon-Kerr provided a number of examples that show both the breadth of the CIMT category and the vagueness of the definition of non-fraud CIMTs. Citing cases, she wrote, "Moral turpitude jurisprudence today suggests that society condemns as immoral the petty thief, but not the person who attacks a police officer." Julia Ann Simon-Kerr, *Moral Turpitude*, 2012 UTAH L. REV. 1001, 1005 (2012). *Compare Michel v. I.N.S.*, 206 F.3d 253, 261 (2d Cir. 2000) (holding that petty theft for stolen bus transfers is a CIMT), *with Zaranska v. U.S. Dep't of Homeland Sec.*, 400 F. Supp. 2d 500, 511, 514 (E.D.N.Y. 2005) (holding that second degree assault on police officer is not a CIMT). "'[A]ggravated fleeing' is inherently base, vile, and depraved, while some forms of aggravated assault do not violate community norms of morality." Simon-Kerr, *Moral Turpitude*, *supra*, at 1005. *Compare Mei v. Ashcroft*, 393 F.3d 737, 741–42 (7th Cir. 2004) (aggravated fleeing), *with Carr v. I.N.S.*, 86 F.3d 949, 950–51 (9th Cir. 1996) (aggravated assault). *See also Alonzo v. Lynch*, 821 F.3d 951, 958 (8th Cir. 2016) ("Assault may or may not involve moral turpitude." (citation omitted)); *Zaranska*, 400 F. Supp. 2d at 514 ("[A]ccording to the BIA, simple assault is not a crime of moral turpitude, but assault with a deadly weapon is; a conviction for misconduct that caused bodily injury is not a crime of moral turpitude, but where the conduct caused serious bodily injury, it is."). "Drunk driving repeatedly is deemed not to involve moral turpitude, but drunk driving with a suspended license is assessed differently." Simon-Kerr, *Moral Turpitude*, *supra*, at 1005. *Compare In re Torres-Varela*, 23 I. & N. Dec. 78, 83–84 (BIA 2001) (en banc) (drunk driving repeatedly), *with*

*Marmolejo-Campos v. Holder*, 558 F.3d 903, 917 (9th Cir. 2009) (en banc) (drunk driving with suspended license).

More examples are easy to find. Some convictions under state hit-and-run statutes are crimes involving moral turpitude while other convictions are not. *See Orosco v. Holder*, 396 Fed. App'x 50, 52–55 (5th Cir. 2010) (failure to report an accident where no injury resulted is not a CIMT); *Latu v. Mukasey*, 547 F.3d 1070, 1073–76 (9th Cir. 2008) (a driver who stops and renders aid but fails to give requisite information to police had not committed a CIMT); *Cerezo v. Mukasey*, 512 F.3d 1163 (9th Cir. 2008) (a conviction under a California hit-and-run statute is not a conviction for a CIMT, but leaving the scene of an accident is a CIMT); *Garcia-Maldonado v. Gonzales*, 491 F.3d 284 (5th Cir. 2007) (a conviction under a Texas hit-and-run statute is a conviction for a CIMT). Citing cases, Kornegay and Professor Lee have provided still more examples. They wrote, "Among the offenses that may or may not be [crimes involving moral turpitude] are manslaughter, fraud, sex offenses against children, child abandonment and child abuse, indecent exposure, assault, misprision of felony, false statements, and driving under the influence." Lindsay M. Kornegay & Evan Tsen Lee, *Why Deporting Immigrants for "Crimes Involving Moral Turpitude" Is Now Unconstitutional*, 13 DUKE J. CONST. L. & PUB. POL'Y 47, 61–63 (2017).

Modern federal courts and the BIA have repeatedly complained that the definition of CIMTs is vague. A sample of such complaints includes *Menendez v. Whitaker*, 908 F.3d 467, 472 (9th Cir. 2018) (stating that "[t]he meaning of the term falls well short of clarity" (citation omitted)); *Arias v. Lynch*, 834 F.3d 823, 830, 835 (7th Cir. 2016) (Posner, J., concurring) (calling CIMT a "stale, antiquated, and, worse,

meaningless phrase," a "vague[]" phrase, "rife with contradiction, a fossil, [and] an embarrassment to a modern legal system," and discussing "remarkable dissent by Justice Jackson" in *De George*, which "exposed [the] emptiness" of the moral turpitude concept); *Bobadilla v. Holder*, 679 F.3d 1052, 1053–54 (8th Cir. 2012) (calling it a "murky statutory standard" and stating, "[w]ithout question, the term [CIMT] is ambiguous."); *Marmolejo-Campos*, 558 F.3d at 909 ("'Moral turpitude' is perhaps the quintessential example of an ambiguous phrase."); *Ali v. Mukasey*, 521 F.3d 737, 739 (7th Cir. 2008) (calling moral turpitude a "notoriously plastic" concept); *Garcia-Meza v. Mukasey*, 516 F.3d 535, 536 (7th Cir. 2008) (calling the standard "notoriously baffling"); *Franklin v. INS*, 72 F.3d 571, 573 (8th Cir. 1995) ("[M]oral turpitude is a nebulous concept and there is ample room for differing definitions of the term."); *Zaranska*, 400 F. Supp. 2d at 513–14 ("'Moral turpitude' historically has referred to conduct which is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general. In other words, there is no useful definition for the term." (internal quotations omitted)); *In re Lopez-Meza*, 22 I. & N. Dec. 1188, 1191 (BIA 1999) ("[B]oth the courts and this Board have referred to moral turpitude as a 'nebulous concept' with ample room for differing definitions of the term. . . . Under this standard, the nature of a crime is measured against contemporary moral standards and may be susceptible to change based on the prevailing views in society."); *Matter of Short*, 20 I. & N. Dec. 136, 139 (BIA 1989) (describing "moral turpitude" as a "nebulous concept"); *Matter of McNaughton*, 16 I. & N. Dec. 569, 574 (BIA 1978) (describing moral turpitude as a "vague" term).

Despite many years of trying, courts and administrators have not been able to establish coherent criteria. *See Nunez v. Holder*, 594 F.3d 1124, 1130 (9th Cir. 2010) ("We have previously discussed at some length the inherent ambiguity of the phrase 'moral turpitude' and the consistent failure of either the BIA or our own court to establish any coherent criteria for determining which crimes fall within that classification and which crimes do not."); *Marmolejo-Campos v. Holder*, 558 F.3d 903, 921 (9th Cir. 2009) (en banc) (Berzon, J., dissenting) ("[T]he BIA's precedential case law regarding the meaning of the phrase 'crime involving moral turpitude' . . . is a mess of conflicting authority."); *Nicanor-Romero v. Mukasey*, 523 F.3d 992, 997–99 (9th Cir. 2009), *overruled on other grounds by Marmolejo-Campos*, 558 F.3d 903 (summarizing Ninth Circuit law on moral turpitude and recognizing that "[w]e have not relied on a consistent or easily applied set of criteria" to identify crimes of moral turpitude); *Partyka v. Attorney General*, 417 F.3d 408, 409 (3d Cir. 2005) (calling moral turpitude jurisprudence an "amorphous morass"); *Mei v. Ashcroft*, 393 F.3d 737, 741 (7th Cir. 2004) ("The Board should not be blamed too harshly [for widely varying results in what is considered a CIMT]; courts have equally failed to impart a clear meaning to 'moral turpitude.' Time has only confirmed Justice Jackson's powerful dissent in the *De George* case, in which he called 'moral turpitude' an 'undefined and undefinable standard.' The term may well have outlived its usefulness." (internal citation omitted)); *Mei v. Ashcroft*, 393 F.3d 737, 739 (7th Cir. 2004) ("Since Congress did not define 'crime involving moral turpitude' when it inserted the term in the immigration statute, and the term had no settled meaning at the time (and has none still), it is reasonable to suppose ala *Chevron* that Congress contemplated that the agency charged with administering the statute would define the term, and

specifically would tailor the definition to the policies embodied in the immigration statutes. The Board of Immigration Appeals has done neither. . . . [T]he Board hasn't done anything to particularize the meaning of 'crime involving moral turpitude' . . . ."); *Tseung Chu v. Cornell*, 247 F.2d 929, 933 (9th Cir. 1957) ("We are not unmindful of the myriad decisions sponsoring various concepts of moral turpitude. They offer no well settled criteria."); *see also De George*, 341 U.S. at 239–40 (Jackson, J., dissenting) ("No one can read this body of opinions and feel that its application represents a satisfying, rational process. If any consistent pattern of application or consensus of meaning could be distilled from judicial decision, neither the Government nor the Court spells it out. Irrationality is inherent in the task of translating the religious and ethical connotations of the phrase into legal decisions. The lower court cases seem to rest, as we feel this Court's decision does, upon the moral reactions of particular judges to particular offenses.").

Justice Alito, joined by Chief Justice Roberts, recently echoed these complaints in *Padilla*, arguing that an attorney did not provide ineffective assistance of counsel when he failed to determine whether a particular offense was a CIMT. Justice Alito listed a number offenses that may or may not be crimes involving moral turpitude (citing R. McWhirter, ABA, *The Criminal Lawyer's Guide to Immigration Law: Questions and Answers* 134 (2d ed. 2006)):

> *See* [McWhirter] at 134 ("Writing bad checks *may or may not* be a CIMT" (emphasis added); *ibid.* ("[R]eckless assault coupled with an element of injury, but not serious injury, is *probably* not a CIMT" (emphasis added)); *id.* at 135 (misdemeanor driving

under the influence is generally not a CIMT, but may be a CIMT if he DUI results in injury or if the driver knew that his license had been suspended or revoked); *id.* at 136 ("If there is no element of actual injury, the endangerment offense *may* not be a CIMT" (emphasis added); *ibid.* ("Whether [a child abuse] conviction involves moral turpitude *may* depend on the subsection under which the individual is convicted. Child abuse done with criminal negligence *probably* is not a CIMT" (emphasis added)).

*Padilla*, 559 U.S. at 379 (Alito, J., concurring).

### 3. Recent Example

A recent decision of our court illustrates Justice Alito's point. Manuel Olivas-Motta was legally present in the United States as a noncitizen lawful permanent resident. *Olivas-Motta v. Whitaker*, 910 F.3d 1271, 1283 (9th Cir. 2018) (Watford, J., dissenting). He had been brought to the United States in 1976 by his parents when he was ten days old. *Id.* He was married to a United States citizen and had two citizen children. *Id.* Most of his extended family lived in the United States as either citizens or lawful permanent residents. *Id.*

Olivas-Motta was charged under Arizona law with aggravated assault and attempted murder. *Id.* If he had been convicted as charged, the conviction would have rendered him removable. *Id.* Olivas-Motta contended that he was innocent of the charges, but he was willing to plead guilty to "reckless endangerment" rather than go to trial if he could be assured that reckless endangerment was not a CIMT. *Id.*

Olivas-Motta's attorney consulted with an experienced immigration attorney who advised that in all likelihood reckless endangerment under Arizona law was not a CIMT. *Id.* The attorney's advice was based on two non-precedential decisions by the BIA that had specifically held that reckless endangerment in Arizona was not a CIMT. Olivas-Motta relied on the immigration attorney's advice, and he pleaded guilty to reckless endangerment. *Id.* at 1284.

Five years after Olivas-Motta's guilty plea, the BIA changed course. In *Matter of Leal*, 26 I. & N. Dec. 20 (BIA 2012), *aff'd sub nom. Leal v. Holder*, 771 F.3d 1140 (9th Cir. 2014), the BIA abandoned the position taken in its two prior decisions, now holding that reckless endangerment under Arizona law is a CIMT. Based on its decision in *Matter of Leal*, the BIA ordered Olivas-Motta removed because he had been convicted of two CIMTs. *Id.* at 1275. Over a dissent by Judge Watford, we denied Olivas-Motta's petition for review. *Id.*

### 4. State Courts' Experience

Use of the phrase "moral turpitude" under state law increasingly has been abandoned or forbidden. Starting in the 19th and 20th centuries, states used the term "moral turpitude" as a criterion to disqualify and impeach witnesses, to decide whether certain language is slanderous, to disenfranchise voters, and to disbar attorneys and revoke medical licenses, among other applications. *See De George*, 341 U.S. at 227 (discussing use of the term in other contexts); Simon-Kerr, *Moral Turpitude*, *supra* (same). Seventy years ago in *De George*, the majority began its discussion by recognizing this history, stating that "[t]he term 'moral turpitude' has deep roots in the law." *De George*, 341 U.S.

at 227. Citing states' use of the phrase in other, non-immigration contexts, the Court reasoned, "In deciding the case before the Court, we look to the manner in which the term 'moral turpitude' has been applied by judicial decision." *Id.* Finding that, "[w]ithout exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude," the Court went on to hold that fraud was a CIMT. *Id.*

But in the decades since *De George*, many states have discontinued use of the phrase "moral turpitude" in various contexts. *See, e.g.*, Simon-Kerr, *Moral Turpitude*, *supra*, at 1040–44. For example, citing the phrase's vagueness and the resulting inconsistent rulings, the vast majority of states have abandoned use of the phrase "moral turpitude" in the context of witness impeachment. *See* Simon-Kerr, *Moral Turpitude*, *supra*, at 1033–39; *see also, e.g.*, *State v. Morgan*, 541 S.W.2d 385, 388 (Tenn. 1976) (reasoning that judges faced great "difficulty" in "applying a test that is vague and cannot be explicitly defined," that the dictionary definition of "moral turpitude" had provided no guidance, and that the standard had produced inconsistent rulings); *Tucker v. Lower*, 434 P.2d 320, 324 (Kan. 1967) (noting that CIMT has "a vague and uncertain meaning which plagues the courts"); *Heating Acceptance Corp. v. Patterson*, 208 A.2d 341, 343–44 (Conn. 1965) (noting that the "uncertainty" of the term "moral turpitude" had caused "not inconsiderable" difficulties for judges and ultimately deciding to abandon the term); Vt. R. Evid. 609, Reporter's Notes on 1989 Amendment (1989) ("Subdivision (a) is amended to replace 'moral turpitude' with more precise and relevant standards for determining the admissibility of prior convictions for impeachment. Moral turpitude was troublesome because it was at once underinclusive and overinclusive, as well as

vague."); Maine R. Evid. 609, Advisers' Note to Former M.R. Evid. 609–February 2, 1976 (calling moral turpitude a "troublesome phrase" before switching to a clearer impeachment standard).

In the context of voter disenfranchisement, use of the phrase has been struck down due to discriminatory intent and impact. *See* Simon-Kerr, *Moral Turpitude*, *supra*, at 1040–41; *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (holding that Alabama's constitutional provision disenfranchising citizens convicted of a crime of moral turpitude was unconstitutional). The term's very "fuzziness . . . made it well suited to the purpose of" selective, arbitrary and discriminatory decision making. Simon-Kerr, *Moral Turpitude*, *supra*, at 1040.

## Conclusion

Rooted in the Due Process Clause, the void-for-vagueness doctrine serves two primary purposes. It "guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes," and it "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Dimaya*, 138 S. Ct. at 1212.

Congress did not define "moral turpitude" when it introduced the term into our immigration law in 1891. Sixty years later, Justice Jackson wrote that "moral turpitude" was still "an undefined and undefinable standard." *De George*, 341 U.S at 235 (Jackson, J., dissenting). Now, almost seventy years after *De George*, "moral turpitude" is as undefined and undefinable as ever.

Justice Scalia wrote of the ACCA's residual clause in *Johnson*, "Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise." *Johnson*, 135 S. Ct. at 2560. We have had not just nine years but more than a century of experience with "moral turpitude." It is time to recognize another failed enterprise.